[No. 1416.]

THE STATE OF NEVADA, PLAINTIFF AND RESPONDENT, *v.* ALPHEUS VAUGHAN, DEFENDANT AND APPELLANT.

(Syllabus by BIGELOW, C. J.)

1—JUROR, CHALLENGE FOR "IMPLIED BIAS," INSUFFICIENT.—A challenge to a juror upon the ground of implied bias is insufficient. The particular ground of a challenge must be specified.

2—CHALLENGE, ALLOWED, NO GROUND FOR EXCEPTION.—The allowance of a challenge to a juror is not the subject of an exception.

3—DYING DECLARATIONS, WHEN ADMISSIBLE.—Where the evidence shows that at the time of making dying declarations the deceased had no hopes of recovery from the wound he had received, the declarations are admissible. His condition of mind may be shown by statements made both before and after the declaration.

4—EVIDENCE, ERROR, HOW CURED.—Where, upon the state's motion, certain evidence was stricken out, but subsequently the motion was withdrawn, and the jury informed by the court that the evidence would stand as evidence in the case, any error in the former ruling is cured.

5—SAME—ASSAULT UPON OTHERS BY DECEASED.—In a case involving the question of self-defense, where defendant claimed that deceased began the fatal affray, evidence tending to prove that at another time than the homicide deceased had attempted to shoot the brothers of defendant was stricken out: *Held*, no error.

6—SAME—REPUTATION OF DECEASED.—Where, in such a case, the defendant had introduced testimony tending to prove that the deceased had a quarrelsome, turbulent and violent disposition; that he had once wantonly shot at defendant, and at the time of the homicide was making a murderous attack upon him: *Held*,

that this was such an attack upon the character of deceased as authorized the state to introduce evidence that the reputation of deceased for peace and quietness was good.

7—SAME—PRESUMPTION.—Upon the trial of the case there was a question as to whether deceased was accidentally at the place where the homicide occurred, or had gone there for the purpose of preventing defendant from passing through a fence. The mother of the defendant testified that the day before, in the presence of the young sister of deceased, she had stated that her son would go to a certain mine the next day, which might have taken them past the place. There was no evidence that the girl had communicated this information to deceased, and upon this ground the testimony was stricken out: *Held*, no error, as there was no presumption that it had been communicated, and, unless it had, it cut no figure in the case.

8—MALICE AFORETHOUGHT—HOW ESTABLISHED.—The jury were instructed that to constitute malice aforethought it was only necessary that there should be a formed intention to kill; that malice aforethought means the intention to kill: *Held*, error, as malice is an inference to be drawn from all the facts in the case, and is not established by mere proof of an intentional killing, for there may be an intentional killing in justifiable self-defense, or where the crime only amounts to manslaughter.

9—INSTRUCTION—IRRELEVANT—WHEN PREJUDICIAL.—The father of deceased owned a ranch through which a road ran, across which he had placed gates. Defendant claimed this to be a public road, and when passing through it he refused to shut the gates. This led to difficulties and a feeling of hostility between defendant and deceased. The court instructed the jury that a person passing through gates in fences enclosing fields without again shutting them was guilty of a misdemeanor: *Held*, that this instruction was upon a point irrelevant to the case, and that it was prejudicial to defendant, in that its only effect was to show that the defendant had committed another crime in regard to the controversy between deceased and himself.

10—IMPROPER INSTRUCTION NOT CURED BY OTHERS THOUGH PROPER. Although the law concerning self-defense and manslaughter is correctly laid down in other instructions, and the law concerning malice is correctly stated in another instruction, it does not cure the error contained in the instruction wherein malice aforethought is improperly limited and defined.—REP.

11—EVIDENCE OF COLLATERAL OCCURRENCES, MATERIALITY OF.—The main question for the jury was whether the defendant acted in self-defense or not. What occurred at the fatal place was the central point, and evidence of collateral occurrences was material only in so far as it tended to throw light upon what took place there.—REP.

APPEAL from judgment on verdict of murder in the first degree and order overruling motion for new trial, from District Court of Lander county; *A. L. Fitzgerald*, District Judge.

The facts are sufficiently stated in the opinion.

*James F. Dennis* and *J. H. Macmillan,* for Appellant:

The first point relied on by the appellant is: That the challenges to the jurors C. W. Hilkey, John Tallack, D. McCloud, George Schutes, O. J. Heath and John Thorpe should have been allowed, and to deny either one was a fatal error.

There are but two cases which we deem it necessary to cite in support of this contention: *State* v. *McClear,* 11 Nev. 39; *State* v. *Murphy,* 37 Pac. Rep. 420. The case of *State* v. *Murphy* was rendered by Dunbar, C. J., and concurred in by a full bench of the supreme court of Washington. It is useless to quote from these cases as they are full of the doctrine. The record shows that defendant asked for and was denied the privilege of an extra peremptory challenge, when in fact he was entitled by reason of the court denying his challenges to six extra peremptory challenges.

The second point is that juror Rapley was a qualified juror in every way. We acknowledge that it seldom is error to excuse a juror, but in this case, we desire the attention of the court to the fact that when the State interposed a challenge, very little grounds were needed to have the challenge sustained; but when the defendant interposed a challenge no opinion, however strong, was sufficient to support the challenge.

The third point is that the dying declaration of Willie Litster was not admissible under the defendant's (appellant's) objections. It was not made to appear that Willie Litster had any prospect of "almost immediate dissolution," and that is the test. (1 Greenleaf on Ev., sec. 158 and note 3; Stevens' Digest on Ev., art. XXVI.)

The only foundation for the introduction of this evidence, is at the time it was introduced, "he said he was going to die, and he knowed he was going to die." Is it not a fact that we are all going to die, and that we all know we are going to die? But we do not know when, where, or of what cause. There never was a dying declaration admitted on such a foundation.

It was error for the court to strike out the latter part of the sheriff's testimony. If any part of the statement was

admissible, it was all admissible, and the jury were the ones
to judge of its truth and weight. It was an admission, and
all of it, or none of it, should have gone to the jury. (Sack-
ett's Instructions to Juries, p. 641; *Conner* v. *State*, 34 Tex.
659; Roscoe's Crim. Ev. 55; *Rilly* v. *State*, 4 Tex. App.
538; *Riland* v. *State*, 53 Ala. 322; *State* v. *Hollinscheit*, 61
Mo. 302.) And Sackett says, at the above-named place:
"Where the verbal admission of a person charged with crime
is offered in evidence, the whole of the admission must be
taken together."

The question asked Charles Vaughan, about defendant's
(appellant's) intention with regard to the shooting, was a
proper question, and that, therefore, the court erred in ruling
it out; right at the time the shooting transpired what was
said was competent and part of the *res gestæ.* Charles
Vaughan should have been permitted to answer the question:
"Were you in the habit of shutting these gates or not?"

The answers of Charles Vaughan were made under duress
at the coroner's jury, and he should not have been com-
pelled to answer on or about them. (Fifth Amendment to
Const. U. S.; Rev. Stats. U. S., sec. 860; *Counselman* v. *Hitch-
cock*, 12 Sup. Ct. Rep. 195; 142 U. S.; Sup. Ct. Rep. 547.)

The question: "What religious denomination do you
belong to?" should never have been answered. It was sec-
tarian. The question asked by the defense was general and
touched the old common law qualifications of the witness'
reliability, but whether he was protestant or catholic, or
how he worshiped God, has never been admissible. "Do
you believe in God, the immortality of the soul, the reward
and punishment for deeds done in this life?" are always
pertinent and admissible. (1 Greenleaf on Ev., note 2, sec.
370, etc.)

"I was afraid of my life of him" (Willie Litster). "State,
from your observation of Willie Litster, what his general dis-
position was." This question should have been allowed, to
show how the defendant regarded him. The jury are the
judge of the defendant's theory of self-defense, and in order
to do so the defendant should have been allowed to testify
what feelings operated upon his mind and the cause which
produced such effect. Whether it was reliable or the truth,

the jury was to judge of its reliability and weight, and the same rule applies to the threats and shot.

The testimony about Lizzie Litster hearing that the Vaughan boys were going to mine the next day should have been left in the case. A girl 12 years of age knowing of the feelings which existed between the families would be sure to go home and tell it, and at any rate, the jury should have been left to judge of it.

The testimony as to Willie Litster's character for peace and quiet should never have been allowed in the case. It had never been attacked.

The court takes out of the case the doctrine of self-defense by instruction No. 2, and does not say that the indictment might include justifiable homicide.

The court takes out of the case the doctrine of self-defense by instruction No. 4, and says that the presumption that the killing is malicious unless *the same proof that establishes the killing shows mitigation,* to the exclusion of any other proof, which, under the law, would be sufficient, no matter from whence it comes.

By instruction No. 5 the jury are told that they must find the defendant did voluntarily and unlawfully kill William Litster, or that he was not guilty. No intermediate course was left to them. We say such an instruction is not law and misled the jury and prohibited them from bringing in any verdict but murder in the first degree, or that the killing was justifiable.

Instruction No. 6 misstates the law and tells the jury that it must appear that the circumstances were sufficient to excite the fears of a reasonable person. We say that it must have appeared to the defendant as a reasonable person that the circumstances were sufficient to excite his fears as a reasonable person, placed as he was at the time.

Instruction No. 8 is misleading in not going far enough and giving the whole section 4582, Com. Laws of Nevada.

Instruction No. 11 takes the doctrine of self-defense out of the case entirely and says " that a killing which is intentional is willful, if the intention to kill has been formed, etc., etc., will be murder in the first degree." Now, every one who shoots in self-defense has the intention to kill formed before

he shoots, and yet no one will say it is murder if done in self-defense.

Instruction No. 14 is in the teeth of the statute, and should not have been given, because the statute says no other definition of a reasonable doubt is to be given but the statute.

Instruction No. 16 draws the attention of the jury to the testimony of the defendant and so does No. 13, and presents to the jury his testimony alone and not in conjunction with others, and, therefore, was not correct.

Instruction No. 17, also, takes out of the case the doctrine of self-defense and says that there need be only the intention to kill and never mentions the words "and not in necessary self-defense."

Instruction No. 18, also, eliminates the doctrine of self-defense and says that "malice aforethought means the intention to kill; and when such means are used as are likely to produce death, the legal presumption is that death was intended." This language conveys the idea that the intention to kill manifests malice no matter how much danger the slayer was in, at the time, from the person killed, and is not law.

Instruction No. 19 is not applicable to the case and is not the law. On the contrary it is unlawful to fence up the public domain by settlers.

Instruction No. 21 again picks out the defendant and his witnesses to the jury, and says if he or any witness for him have sworn falsely, you may disbelieve them. Such picking out of the defendant and his witnesses, and constantly holding him or them up to the jury takes the place of bold assertion; that the defendant is not to be believed, nor are his witnesses to be relied upon.

The court tells the jury Rask may be believed, although he acknowledged to perjuring himself before the coroner's jury, the committing magistrate and the grand jury, and that he lied in the district attorney's office. Yet the court tells the jury they may believe him, but does not say if you believe he has lied or sworn falsely, you may reject his testimony.

Instruction No. 24 totally ignores all kind of provocation which might reduce it to murder in the second degree, or manslaughter, and just says: "If he did the killing not in

necessary self-defense, it would constitute murder in the first degree."

These instructions are biased, one-sided and misleading, and no instruction which is misleading is cured by an instruction which gives the law correctly afterwards. This rule is clearly set forth in the case of *People* v. *Berlin*, 35 Pac. Rep. 499, and authorities therein cited in the dissenting opinion of Smith, J., and on rehearing concurred in by Merritt, C. J., and made the opinion of the court. "The rule that when a charge is erroneous in one part, and injurious to a defendant, the mere stating of a correct rule in another part does not cure it," is established by every authority entitled to respect. (*Brown* v. *McAllister*, 39 Cal. 577; *Aguirre* v. *Alexander*, 58 Cal. 21; *Fredrick* v. *Allgair*, 83 Mo. 602; *Knowlton* v. *Fritz*, 5 Ill. App. 217; *R. R. Co.* v. *Monroe*, 47 Mich. 152; 10 N. W. 179; *Phillips* v. *Jamieson*, 51 Mich. 153; 16 N. W. 318; *Murray* y. *Com.*, 79 Pa. St. 311; Thompson's Trials, sec. 2326.)

We believe that there are many errors in the case, which is noticed in our bill of exceptions—in fact, the record bristles with them—but feel confident that *each* of the many we have herein pointed out, would in itself, be sufficient error to reverse the case.

*Robt. M. Beatty*, Attorney-General, and *W. D. Jones*, District Attorney of Lander county, for Respondent:

The first point relied upon by appellant is that the challenges to the jurors Hilkey, Tallack, Thorpe and others should have been allowed. They fail to show that John Thorpe was the only juror named who served on the jury. This is true, however, for Thorpe is the only one of the jurors complained of that served upon appellant's jury, Hilkey, Tallack and others having been peremptorily challenged by appellant. Thorpe was challenged by appellant for "implied bias," which was overruled by the court. After this proceeding as to Thorpe, and before the jury was sworn, appellant exercised three peremptory challenges, being apparently satisfied with Thorpe as a juror. The challenge to Thorpe, Hilkey, Tallack and others complained of were all challenges for "implied bias." The statutes of this state (Gen. Stats. 4220, amended 1889, 83) permit a chal-

lenge for one or more of nine causes. In the challenge to Thorpe appellant failed to name any one of the statutory causes. In *State* v. *Gray*, this court said: "If the challenge be considered as made for implied bias it was properly overruled, because it does not set forth any ground upon which a challenge for implied bias may be made." (*State* v. *Gray*, 19 Nev. 212, *et seq.*; 12 Cal. 492; 16 Cal. 130; 4 Denio, 31; 2 Green (N. J.) 195; 37 Cal. 258, 277; 41 Cal. 429; 2 Nev. 231; 6 Nev. 327; 11 Nev. 106.)

These authorities are ample to dispose of the challenges; they are conclusive, but on the principle that the last should be the strongest and to clinch the point we cite Gen. Stats. 4222: "In a challenge for implied bias, one or more of the causes stated in section three hundred and forty (4220) *must be alleged.*" The defendant had the power and the right to use his peremptory challenges as he pleased; he was free to use or not to use them, as he thought proper, but having resorted to them they must be followed out to all their legitimate consequences. (*Freeman* v. *People*, 47 Am. Dec. pp. 228-9; 47 Am. Dec. 238; 2 Keyes, 243; 54 Barb. 341; 6 Park. (N. Y.) 199.) He thereby voluntarily blots out all error, if any occurred, in overruling the challenges for cause, and cannot be heard to allege any exception as to those jurors.

In accepting Thorpe while the accused had unused peremptory challenges he is estopped from complaining that Thorpe was not impartial. (*Spies* v. *People*, 3 Am. St. Rep. 320.)

As to juror Schutes his case was doubly cured, for before he was peremptorily challenged he was challenged for actual bias. Triers were appointed who found the challenge untrue, which was final as to his qualifications as a juror in the case. (Gen. Stats., sec. 4231; *State* v. *Gray*, 19 Nev. 213; 49 Cal. 166.)

The second point made by appellant is "that the juror Rapley was a qualified juror in every way." Counsel "admit that it is seldom error *to excuse* a juror on challenge." The supreme court of California in *People* v. *Murphy*, 45 Cal. 137, say: "The action of a trial court in *allowing* a challenge to a juror for implied bias is not open to review."

The defendant peremptorily challenged Schutes. "The decision of the triers is final" (Gen. Stats. 4231), and it

" is not subject to exception or review upon appeals." (*State* v. *Gray*, 19 Nev. 213.)

The juror Thorpe was a qualified juror under *State* v. *Millian*, 3 Nev. 430; 16 Cal. 162;· 18 Conn. 166; 9 Fla. 215; 24 Ga. 297; 18 Ga. 333; 45 Ga. 225; 3 Gilman, 368; 7 Ind. 332; 53 N. Y. 164; 2 Dev. & Bat. 196; 42 Tex. 377.

Where a juror states that he has an opinion that it would take *evidence to remove,* yet, if it appear that he could discard that opinion, and render an impartial verdict without being influenced by the opinion, *he is not disqualified.* (*People, ex rel. Phelps,* v. *Oyer & Termine,* 83 N. Y. 436, affirming 19 Hun. N. Y. 91; 94 Ill. 305; 48 Cal. 253; 49 Cal. 174; *Kumli* v. *S. P. Co.,* Sup. Ct. of Or., vol. 28, p. 673, followed the sound doctrine laid down by Chief Justice Marshall, 1 Burr's Trial, 416.)

Before a juror is disqualified his opinion must be a fixed, absolute, positive, definite, decided, substantial, deliberate, unconditional one. The rule is almost universally laid down by these words or words of similar import. A conditional, hypothetical, contingent, intermediate, floating, indefinite, uncertain opinion will not do. (*Schœffler* v. *State,* 3 Wis. 823; *People* v. *Bodine,* 1 Denio, 281; *Staup* v. *Com.,* 74 Pa. St. 458; *Willis* v. *State,* 12 Ga. 444; *Quiander* v. *Com.,* 3 Leigh, 780; *Stout* v. *People,* 4 Parker's Crim. Rep. 71; 1 Thomp. Tr., sec. 78; *Kumli* v. *S. P. Co.,* 28 Pac. 639; *Com.* v. *McMillian,* 22 At. Rep. 1029; *People* v. *McGonegal,* 17 N. Y. Supp. 147.)

The case of *State* v. *Murphy,* 37 Pac. 420, cited by appellant, is not in point here. In that case, when appellant was forced to take juror Kile, defendant's peremptory challenges were all exhausted. *State* v. *McClear,* 11 Nev. 39, does not support the contention of appellant. The dying declarations of Willie Litster, the deceased, were clearly admissible. (1 Bishop Crim. Proc., 3d ed., 212, sec. 1; *People* v. *McLaughlin,* 44 Cal. 435; *People* v. *Vernon,* 35 Cal. 49; 1 Greenleaf's Ev., sec. 156, 158; Wharton's Crim. Ev., 276; *Swisher* v. *Com.,* 21 Am. Rep. 330–331.)

The foundation for the dying declarations of deceased was fully laid. (9 Nev. 394; 21 Am. Rep. 330–337; *State* v. *Wilson,* 36 Am. Rep. 257; 36 Am. Rep. 294–6; 1 Greenleaf's Ev., sec. 158 and note 2, p. 184; 1 East's P. C. 357; 1 Starke Ev. 523; *Bull's Case,* 14 Pratt, 613.)

In *State* v. *Streeter*, 20 Nev. 403, this court held: "Objections to questions asked a witness and ruled out by the court become immaterial and will not be considered in the appellate court where it affirmatively appears that the witness was afterward allowed to answer questions of the same import.

It was not error to ask Nick Rast the question: "What religious denomination do you belong to?"· It was brought out by the defendant.

We notice that in copying the instructions into the bill of exceptions counsel have made a few errors and omissions. We suggest that the court use the instructions in the record that were copied by the clerk, as they are free from error. In No. 14 counsel for appellant omit the word "mathematical" entirely. The appellant alleges error in each of the twenty-seven instructions given on behalf of the state, but argue only fifteen, and we take it that they waive objection to those they do not argue.

We are unable to find any error in any of the instructions. From Nos. 1 to 14, inclusive, were given by Judge Beatty in *State* v. *Anderson*, 4 Nev. 465, and by that judge in every murder case tried before him until he left the *nisi prius* bench, and after that these same instructions were given by Judges Boalt and McKenney for all the years they were judges, and not one of those fourteen instructions have ever been unfavorably criticized by this court, although presented to it on appeal times without number.

Instruction 15, immediately following 14, gives the statutory definition of reasonable doubt verbatim, and this was the only definition of reasonable doubt given in the case. (*State* v. *Potts*, 20 Nev. 389.) No. 16 is statutory; it is a copy of our statutes of 1889, p. 27, chap. 21. Nos. 17 and 18 each state the law of this state. No. 19 is statutory. (Stats. 1891, p. 36, chap. 36.) No. 20 is not argued. No. 21 states the law correctly, and so does No. 22. No. 23 is not argued. There is no error in No. 24; it clearly says: "If from the evidence you believe that Alfred Vaughan killed Willie Litster, * * * not in necessary self-defense, but with malice aforethought, willfully, deliberately and premeditatedly, * * * then such killing would constitute murder in the first degree, and you should find this defendant guilty thereof."

We ask the court to read the instructions given on behalf

of defendant. There are twenty-nine of them and they are each fair and favorable to him. His counsel sought and obtained every legal principle and definition known to the law to avoid to him the awful consequences of his premeditated, willful and deliberate act of feloniously slaying Willie Litster.

If the evidence in this case does not justify the verdict, this court will never be called upon to review a case where it does. [Evidence reviewed at length.]

The law in its majesty demands that just punishment be meted out to Alfred Vaughan for the killing of Willie Litster. He who shall, without authority of law, and with malice aforethought, either express or implied, kill a human being, shall be deemed guilty of murder in the first degree. Alfred Vaughan so killed Willie Litster; he has been duly convicted of that crime.

By the Court, BIGELOW, C. J.:

The defendant was convicted of murder in the first degree for the killing of William Litster, Jr. At the time of the homicide the defendant was 21 years of age, and the deceased 16. For some time prior to the killing, there had been trouble between the family of defendant and the family of deceased. This seems to have been greater between defendant and deceased than between the other members of the families, and was principally concerning the right to free passage through a ranch owned and possessed by the father of deceased, situated in Boone Cañon, some four or five miles above the ranch owned by the father of defendant. The Litster ranch was inclosed with a wire fence, which crossed the road running up the cañon, gates being put in at the crossings. The Vaughans claimed this to be a public road, and sometimes, when passing along it, they left these gates open.

On the morning of the day of the homicide, the defendant, his brother Charles, and a hired man started, with a team loaded with supplies, to go to a mining claim owned by them in the hills or mountains above the Litster place, which they intended working. They passed into the Litster ranch through the lower gate, and up through it, nearly to the upper side, where they turned off the main road for the

purpose of taking a road up a side cañon known as "Water Cañon," which ran in the direction of the mine. A few rods from where they turned off they came to a division fence crossing the road, and through which it was necessary for them to pass. There was no gate in this fence, but there was a place where the wires had been previously taken apart by people passing through, though the gap was then closed. At this point they met the deceased and an elder brother, who objected to their passing through the fence. In the difficulty which ensued both the Litsters were killed by the defendant with a Winchester rifle, the brother dying immediately, and William living but a few hours. As to this difficulty the testimony differs widely; that of the state tending to show a willful and unprovoked murder by the defendant, and that upon the part of the defendant that the Litsters were making a violent assault upon him, one with a pistol, and the other with an axe, and that, to save his own life, he was compelled to shoot them.

1. Several errors are assigned upon the court's rulings denying the defendant's challenges to trial jurors who were challenged on the ground of "implied bias." This is not such a challenge as the statute requires. The term "implied bias" covers nine different grounds of challenge. (Section 340 of the act regulating criminal proceedings, Gen. Stats., sec. 4220.) Gen. Stats., sec. 4222, provides that, "in a challenge for an implied bias, one or more of the causes stated in section 340 must be alleged." This was not done, and consequently the challenge was insufficient to raise any point for the consideration of this court. (*State* v. *Gray,* 19 Nev. 212, 218; *State* v. *Raymond,* 11 Nev. 98, 106.)

2. It is claimed that the evidence shows the juror Rapley to have been a qualified juror, and, consequently, that the court erred in excusing him upon a challenge by the state. But the right to reject does not include the right to select jurors. If the defendant was tried by an impartial jury, that is all he has the right to demand; he has no vested right to be tried by some particular juror. Besides, the action of the court in allowing challenges is not made the subject of an exception. (*State* v. *Larkin,* 11 Nev. 314, 325; *State* v. *Pritchard,* 15 Nev. 74, 79.)

3. The third point is that the dying declarations of the

deceased were not admissible, for the reason that no suffi-
cient foundation had been laid; that it did not appear that
they were made under a prospect of " almost immediate dis-
solution." The evidence shows that the boy was shot about
11 o'clock in the forenoon; that he fell at the place where
shot, or very near it, and lay there until carried to the house,
where he died about 4 o'clock that afternoon; that he suffered
greatly from the wound, and stated that " he was going to
die, and he knew he was going to die right away;" that he
refused to take medicine, saying there was no use to take it;
there was nothing could do him any good. A physician had
been sent for, but he said he would be dead before the doctor
could see him, and, in fact, did die before his arrival. This
evidence was uncontradicted, and, if not sufficient founda-
tion for the admission of the declarations, we are unable to
see what would be. The fact that these statements that he
expected to die were not all made prior to his first relation of
the circumstances of the homicide is immaterial. The cir-
cumstances were told several times after they were made,
and, in fact, the only figure these statements cut is to show
that his relation of the circumstances was made under the
expectation of impending death. They show that from the
first he had no hopes of recovering, and that is sufficient.

4. The officer who arrested the defendant, testifying in the
case, was asked what the defendant said at the time of the
arrest, and replied: "Alpheus Vaughan said, 'I shot Willie
Litster;' I think it was 'in self-defense.'" The prosecution
moved to strike out the latter part of this answer, presum-
ably the part stating that the shooting had been done in
self-defense, and the motion was granted. Subsequently, how-
ever, on the same day, the prosecution asked to withdraw the
motion, and that the whole answer be permitted to stand.
The court thereupon informed the jury that the objection to
the testimony had been withdrawn, and that the entire
answer was before them as evidence in the case. We see no
reason to doubt that this cured the error in the first ruling,
and it is unnecessary to consider it further..

5. Charles Vaughan testified that about a year prior to the
homicide, while he and another brother, Frank Vaughan, were
working at the mine, the two Litster boys had shot at them
twice, apparently either wantonly or for the purpose of driv-

ing them away. This evidence was, upon motion by the prosecution, stricken out. While the practice of admitting testimony without objection, and then moving to strike it out, is one not to be commended, particularly when done by the state in a criminal case, where about the only effect of striking it out is the additional chance of making an error, we do not think that the court erred in the ruling here. Evidence of collateral matters should only be admitted when it has some tendency to throw light upon the circumstances surrounding the killing. This is the principle upon which threats, previous attacks, etc., made by deceased upon the defendant, are admitted. Ordinarily, assaults made upon a third person by deceased could only bear upon his general character or disposition, and as to that it is only evidence of general reputation, and not of particular actions, that is admissible. We do not think the evidence shows such a feeling by deceased against Charles and Frank Vaughan and the defendant jointly as should alter this rule.

6. The prosecution was permitted in rebuttal, over the defendant's objections, to introduce testimony to prove that the character of deceased for peace and quietness was good. It is argued that this was error, because his character had not been attacked. But there may be such attacks made as will authorize the admission of evidence of good character without any witness having testified directly that the reputation of the attacked party was bad, and that seems to be the case here. The defendant, and others in his behalf, had testified to many facts tending to show that the deceased possessed a quarrelsome, turbulent and violent disposition; that he was in the habit of using very bad language towards the defendant and his family; that he had frequently made threats against them, including defendant; that upon one occasion he had wantonly shot at him, and at the time of the homicide was making a murderous assault upon him. We think this was equivalent to proving his character as a quarrelsome, turbulent, and violent boy, and fully justified the admission of the evidence of good character in rebuttal. (*Davis* v. *People*, 114 Ill. 86, 95; *Bowlus* v. *State*, 130 Ind. 237; *Fields* v. *State*, 134 Ind. 46; *Russell* v. *State*, 11 Tex. App. 296: *Everett* v. *State*, 24 S. W. 505.)

7. The mother of defendant testified that, the day before

the homicide, she had been at a neighbor's house, and there stated, in the presence of a sister of deceased, about 10 years of age, that her sons were going to the mine the next day. No objection was made to this testimony when offered, except that the attorneys for the state stated that they reserved the right to move to strike it out if not properly connected. At the close of defendant's case, they made this motion, upon the ground that it did not appear that the girl had told her brothers of what she had heard, and the evidence was stricken out. It is now contended that this ruling was wrong, because the jury might have inferred that she had done so. But, before evidence of one fact should be admitted as presumptive evidence of another fact, there should be some usual and recognized connection between them. This does not exist here. The information may have been communicated, or it may not. There is as much probability one way as the other. At the best, the deduction would be a "mere guess," which is not permissible. (1 Greenl. Ev., 15th ed., sec. 13, note; *Douglass* v. *Mitchell*, 35 Pa. St. 440; *Manning* v. *Insurance Co.*, 100 U. S. 693.)

8. The "Catechism of the Christian Doctrine" was improperly admitted in evidence, but it was so entirely immaterial that it could not have influenced the verdict in any way, and consequently the error was harmless to the defendant.

9. As already stated, the defendant admitted the killing by shooting with a rifle, but claimed it had been done in self-defense. Under these circumstances, the issues before the jury were (1) whether this defense had been made out; (2) if not, of what degree of crime the defendant was guilty. It was in the power of the jury to find him guilty of murder in the first degree, murder in the second degree, or of manslaughter. It consequently became highly important that correct instructions defining the distinctions between these different degrees should be given. In the second instruction the court informed the jury that murder is the unlawful killing of a human being with malice aforethought, either express or implied, which is correct. But in the eighteenth instruction, in attempting a definition of malice aforethought, this language was used: "The use of a dangerous weapon under a provocation by words only, or under no provocation, is always evidence of malice aforethought. To

constitute malice aforethought, it is only necessary that
there be a formed intention to kill. Malice aforethought
means the intention to kill; and, where such means are used
as are likely to produce death, the legal presumption is that
death was intended." This, we think, was error. The fact
that a killing was intentional does not necessarily prove that
it was done with malice; for an intentional killing may be
entirely justifiable, as where it is done in necessary self-
defense, or it may be only manslaughter, as where it is done
in the heat of passion caused by a sufficient provocation.
What it is must depend upon the manner of the killing and
the surrounding circumstances. The instruction was highly
prejudical to the defendant, for, if guided by the law there
laid down, the jury must have reasoned thus: (1) The
defendant admits the use of such means as were likely to
produce death, and that did produce death; therefore, the
presumption is that death was intended. (2) An intention
to kill constitutes malice aforethought. (3) A killing with
malice aforethought is murder. Therefore, upon the defend-
ant's own admission, without regard to anything else, he is
guilty of murder. We say without regard to anything else,
because, although the law concerning self-defense and man-
slaughter is correctly laid down in the instructions, they con-
tain nothing, and, indeed, scarcely could contain anything to
correct the error made here. In the twenty-fifth instruction
the law concerning malice is correctly stated, and, as it
clearly demonstrates the error of the eighteenth instruction,
we quote from it: " The existence or non-existence of malice
is an inference to be drawn from all the facts in the case. If
malice is found, it must be drawn as an inference from every-
thing that is proved taken together as a whole. Every fact,
no matter how small, every circumstance, no matter how
trivial, which bears upon the question of malice, should be
considered by the jury at the same time that they consider
the use of the deadly weapon, to wit, the gun with which the
defendant here admits that he shot the deceased, Willie
Litster; and it is only as a conclusion from all these facts
and circumstances that malice is to be inferred." But, of
course, the giving of a correct instruction does not cure an
incorrect one, because it is impossible to determine which
the jury followed. That an intention to kill does not con-

stitute malice is well settled by the authorities. In *Dennison* v. *State*, 13 Ind. 510, the trial court had instructed the jury that, "if there be evidence of express malice—that is, a positive intention to kill—existing in the mind of the slayer at the time of inflicting the wound, the killing is murder in the second degree." Commenting upon this, the court said: " This latter instruction contains an error which may have misled the jury. It informs them that intention to kill, existing at the commission of the act, constitutes express malice. This is entirely wrong. In justifiable homicide there is intention to kill, but not necessarily malice or premeditation. In murder in the first degree there is intention to kill, accompanied with premeditated malice, except in certain cases in which certain acts are made murder by statute. In murder in the second degree there is intention to kill, accompanied by malice, but without premeditation. In manslaughter there may be intention to kill arising from the sudden transport of passion, but it may, and must in this grade of offense, be unaccompanied by both premeditation and malice. In *Trumble* v. *Territory*, 3 Wyo. 280, 21 Pac. 1081, the following instruction was held to be erroneous: " Where the fact of killing purposely by the use of a deadly weapon is proved, malice is to be presumed, unless it appears from all the evidence in the case that the killing was without malice, or was justifiable or excusable;" the court saying: " The jury should be directed that it was their duty to decide from all the facts of the case, many or few, whether the killing was malicious." In *People* v. *Barry*, 31 Cal. 357, where the instruction was in case of a mutual combat," when one uses superior weapons to those possessed by the party slain, malice may be inferred, and the killing amounts to murder," the court said: " If A should make an assault upon B with a deadly weapon, by the use of which he might readily accomplish his manifested purpose to kill B, and the latter, having no other means of saving his own life except by killing his assailant, should in necessary self-defense, slay him, could it be seriously contended that the act done in such necessary self-defense was done with malice, and that the killing was murder, because it happened that the weapon so used in self-defense was superior to that in the hands of the assailant? No one, we apprehend, would

deliberately undertake to support such a proposition." To the same effect are *People* v. *Freel*, 48 Cal. 434; *Quarles* v. *State*, 1 Sneed, 407; *Maher* v. *People*, 10 Mich. 212; *Erwin* v. *State*, 29 Ohio St. 186; *Cahn* v. *State* (Tex. App.) 11 S. W. 723; 2 Bish. Cr. Law, secs. 645, 676, 695; Whart. Hom., sec. 669; *Stokes* v. *People*, 53 N. Y. 164; *Kent* v. *People*, 8 Colo. 563.

10. The jury were also instructed that any person passing through gates in fences inclosing fields, and not shutting and fastening the same, shall be deemed guilty of a misdemeanor. While this was substantially copied from the statute, we cannot but regard it as erroneous and prejudicial to the defendant, under the circumstances existing here. In the first place, it is, at least, doubtful whether the statute would apply to the case of a gate placed across a public road, as it appears the Vaughans claimed this to be. But, disregarding that, the instruction was upon a point that cut no legitimate figure in the case. As we have seen, the main question for the jury to decide was whether the defendant, in killing William Litster, had acted in self-defense. It was proper and necessary for them, in determining this question, to consider everything admitted in evidence that would assist in coming to a correct conclusion as to what occurred at the fence that fatal morning. That was the central point, and evidence of collateral occurrences was only material in so far as it tended to throw light upon what took place there. Did the defendant kill the deceased without cause or excuse, or did the Litsters first make such a murderous attack upon him that he was justified in killing in self-defense, as he claims? As reflecting upon this, as well as upon the question of malice, it was proper to show the state of feeling existing between the parties. There was a conflict in the testimony as to what occurred when they met. If the defendant had such feeling against the deceased as might prompt him to attack and murder him without cause, this would strengthen the case of the prosecution. On the other hand, if the feelings of the deceased toward the defendant were such as might have caused him to make the first murderous assault, its tendency would be to strengthen the defense. In showing this, evidence concerning the gates was necessarily admitted, because this was the matter, or one of the matters, about which the feeling had arisen; but the fact that, in leaving them open,

the defendant had committed a misdemeanor, had no tendency to show an increase or diminution of his animosity, nor, indeed, that he had any animosity whatever. The defendant was not being tried for leaving gates open, and the instruction was no more relevant to the issue before the jury than would have been an instruction that taking another's horse amounted to larceny had there been evidence that at some time the defendant had taken some other person's horse. It was calculated to create prejudice against the defendant, by showing that he had committed a crime in another matter, and to divert the minds of the jurors from the real issue in the case.

11. In regard to the fourteenth instruction concerning reasonable doubt, in view of the fact that the case must be retried, it is only necessary to call attention to what was said by this court in *State* v. *Potts*, 20 Nev. 389, 399, concerning the advisability of adhering strictly to the statutory definition.

This is sufficient to dispose of the appeal; but, in view of the fact that the case will have to be retried, it is proper for us to notice other rulings that, although they have not been particularly called to our attention, were, some of them at least, objected to by the defendant, and, if repeated, may be urged as error upon another appeal. As already stated, the only evidence properly admissible is that which in some manner tends to throw light upon the killing. Upon the opening, it was necessary for the state to introduce its evidence tending to establish the commission of the homicide by the defendant, and such as tended to prove that it was malicious, willful, deliberate, and premeditated. In defense, the defendant could introduce his evidence tending to show that it was done in self-defense, including such as might tend to prove that the feelings of deceased towards the defendant were such as might have caused him to begin the deadly affray, or to make the first attack. Rebuttal evidence would then be all that tended to establish that the killing was not done in self-defense. Perhaps this general statement will not assist very materially upon a retrial; but in the face of such a voluminous record, unassisted by argument upon the points, it is difficult to draw the line as to all that was properly admitted and what was not. Without

attempting this, it is safe to say there was much evidence on both sides that could have no legitimate influence upon the verdict. In our judgment, as the case is now presented, the evidence as to whether there was any other road that the Vaughans might have taken in going to their mine, whether the road up Water Cañon was good or bad, whether they had any mine, whether a team that had been driven up to the fence could be turned around without passing through the gap, whether the elder Vaughan had ever asked permission of William Litster, Sr., to pass through the fence, of the conversation between them concerning the poisoning of the dog, of what title Litster had to his ranch, was all irrelevant, could only tend to distract the attention of the jury from the real issue, and, so far as objected to, should have been excluded.

Of course, nothing we have said must be construed as in any way reflecting upon the defendant's guilt or innocence. That is a question for a jury, and is one that we have not at all considered. However guilty he may be, he is entitled to a trial in accordance with the rules of law; and, as we find that in some respects he has not had this, the judgment must be reversed.

Judgment reversed, and cause remanded for a new trial.